Annie L. Strawder et al. [1] v. Commissioner. Strawder v. Commissioner
Docket Nos. 52734, 52735, 52772, 60455.
United States Tax Court
T.C. Memo 1958-82; 1958 Tax Ct. Memo LEXIS 154; 17 T.C.M. (CCH) 406; T.C.M. (RIA) 58082; April 30, 1958
Joseph Hartman, Esq., C.P.A., Clark Building, Jacksonville, Fla., and Llewellyn A. Luce, Esq., for the petitioners. Hugh G. Isley, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In Docket Nos. 52734 and 52735 respondent made the following determinations against each of the petitioners W. R. Strawder, Jr., and Annie L. Strawder, who were married and filed joint returns during and for the taxable years 1949 and 1950, but were subsequently divorced: Addition
Addition
to Tax, Sec-
to Tax,
tion 293(b),
Section
I.R.C.
294(d)(2),
Year
Deficiency
1939
I.R.C. 1939
1949
$ 1,369.40
$ 684.70
1950
15,131.80
7,565.90
$953.07
In Docket No. 52772 respondent determined *155 a deficiency in income tax and additions to tax under sections 293(b), 291(a), and 294(d)(2), I.R.C. 1939, against petitioner W. R. Strawder, Jr., for the year 1951 in the respective amounts of $46,394.09, $23,197.05, $11,598.52, and $2,649.90. In Docket No. 60455 respondent determined deficiencies in tax and additions to tax under sections 293(b), 291(a), 294(d)(1)(A), and 294(d)(2), I.R.C. 1939, against petitioner A. W. Boynton for the years 1950 and 1951, as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
293(b)
291(a)
294(d)(1)(A)
294(d)(2)
Year
Deficiency
I.R.C. 1939
1950
$18,163.52
$ 9,081.76
$1,841.55
$1,104.93
1951
40,805.22
20,402.61
$10,201.31
4,072.42
2,443.45
The deficiencies in all of these cases, consolidated for trial and opinion, result from respondent's determination that petitioners received during the taxable years unreported income from a gambling enterprise operated by petitioners W. R. Strawder, Jr., and A. W. Boynton during 1950 and 1951, and in 1949 by Strawder and Rhodes Boynton who died in the latter part of that year. Findings of Fact *156 Some of the facts have been stipulated. We incorporate herein by this reference the stipulation of facts and the exhibits attached thereto and identified therein. W. R. Strawder, Jr., sometimes hereinafter referred to as Strawder, is a resident of Jacksonville, Florida. Annie L. Strawder was the wife of Strawder during the years 1949 and 1950 but they are now divorced. For these years they filed joint Federal income tax returns with the then collector of internal revenue for the district of Florida. Strawder filed no Federal income tax return for the taxable year 1951. A. W. Boynton, sometimes hereinafter referred to as Boynton, is a resident of Orlando, Florida. For the taxable year 1950 Boynton filed a Federal income tax return with the then collector of internal revenue for the district of Florida. Boynton filed no Federal income tax return for the taxable year 1951. Strawder and Boynton are sometimes referred to hereinafter as the petitioners. In his joint return for the year 1949 Strawder listed his occupation as "Salesman" and reported net income as follows: Total Receipts
$8,653.10
Less: Depreciation on automobile
$408.10
Travel and automobile ex-
penses
581.50
Meals and Lodging away
from home and tele-
graph and telephone ex-
penses
269.00
1,258.60
Adjusted Gross Income
$7,394.50
Less: Standard deduction
739.45
Net Income
$6,655.05
*157 In his joint return for the taxable year 1950 Strawder again listed his occupation as "Salesman" and reported net income as follows: Total Receipts
$16,263.00
Less: Depreciation - automobile
$445.25
Travel and Automobile Ex-
penses
861.50
Meals and Lodging away
from home and tele-
graph and telephone
expenses
338.50
1,645.25
Adjusted Gross Income
$14,617.75
Less: Standard Deduction
1,000.00
Net Income
$13,617.75
In his return for the taxable year 1950 Boynton listed his occupation as "Night Club Operator" and reported income as follows: Partnership, joint venture, etc.
Flamingo Club, Oriando, Florida
($ 7,271.59)
Other sources: Gain from gam-
bling ventures
12,530.00
Capital loss carryover
( 1,000.00)
Adjusted Gross Income [1]
$ 4,258.41
Boynton's 1950 return was prepared by T. C. Wooten, an accountant. Wooten was accountant for the nightclub operation only. During the taxable years 1949, 1950, and 1951 Strawder and Boynton lived in Orlando, Florida. Prior to 1949 Boynton and Strawder had engaged in various activities. Since his graduation from college in 1939, *158 Boynton had owned and operated a nightclub in Albany, Georgia, had dealt cards at a gambling table, and had handled dice games. In 1948 Boynton went to Orlando, Florida, where he became associated with his brother Rhodes Boynton in the operation of a nightclub called the Flamingo Club. Strawder became associated as an equal partner with Rhodes Boynton in 1949 in the operation of certain lotteries. On November 6, 1949, Rhodes Boynton died and Boynton and Strawder continued to operate the Flamingo Club and the lottery business as equal partners. Boynton managed the nightclub while Strawder was primarily responsible for the operation of the lottery business known as Cuba. The operation of this business was centralized in a clubroom in the rear of the Flamingo Club. "Cuba" is a lottery which is operated in the following manner: The bettor places his bet on one or more numbers from 0 to 99 with a salesman known in the trade as a "writer." The writer then reports the bet to the operator who pays the writer a commission on bets made with him. At some time after 2 p.m. on each Saturday during the year the winning number of the grand prize of the Cuban lottery is announced. The winning *159 Cuba number is taken from the last two digits of the grand prize number in the Cuban lottery. The winning bettor is paid 70 times the amount of his bet. The petitioners' writers would report to them the amount of money bet on each number. After the winning number had been ascertained, the petitioners would settle with the writers. If the writer's book showed a net loss, they would collect; if the book won, the writer would be paid the net amount of such winnings in order that he could pay off the winning bettors. Frequently the amounts bet on one particular number will be large in comparison to the total amounts bet. In such cases operators (such as petitioners were) often hedge by "laying off" against the excessive losses which would result if a so-called "hot" number won. "Laying off" means rebetting on the heavily played numbers with another operator. This procedure was followed by petitioners during 1950 and part of 1949 and 1951. In order to avoid an excessive amount of bets on any one particular number, the petitioners placed a limit on the amount of bets which a writer could accept on each number. The amount of the limit varied according to the total amount of sales which *160 the writer made. Frequently, however, the larger writers would accept bets in excess of their limit as an accommodation to their customers. The petitioners did not pay the writers any commission on the amount of bets placed with them in excess of their limit. The amount of the bets received by petitioners in excess of the limits placed upon the writers and on which no commission was paid is called "overlay in." From July 9, 1949, to January 20, 1951, Strawder, acting on behalf of his several partnerships, placed lay-off bets with Mathews-Shepherd, a gambling partnership in Phenix City, Alabama, sometimes referred to by petitioners (and herein) as "Hoyt" (the first name of Mathews). Strawder was entitled to receive a commission of 5 per cent of all of such lay-off bets from July 9, 1949, to August 13, 1949. Effective August 13, 1949, the commission was raised to 10 per cent. This arrangement continued until Strawder ceased to place lay-off bets with Mathews-Shepherd on January 20, 1951. In addition to these commissions, Strawder was entitled to receive 25 per cent of the net wins of Mathews-Shepherd on all lay-off bets placed with the latter. During the period January 1, 1950, to *161 November 30, 1951, Boynton and Strawder operated the following Cuba lotteries as equal partners during the period indicated: Name
Period
of Lottery
of Operation
Orlando
1- 7-50 to 10-27-51
Cotton
1- 7-50 to 9-15-51
Mike
6-17-50 to 7-15-50
Oviedo
1 7-50 to 9-15-51
P-W
7-14-50 only
The largest of these lotteries was the Orlando lottery. The petitioners kept an "in and out book" or a book of weekly summary sheets for each lottery. These sheets contained sufficient vertical spaces for 50 names. The name of the writer was inserted under the column headed "name," Adjacent to the writer's name and under the column headed "in" was entered the amount of bets received by petitioners from the writer less the amount of "overlay" bets received from the writer and also less his commission of 12 1/2 per cent. Under the "out" column, and to the right of the writer's name, was entered the amount of hits or wins attributable to the "in" bets recorded adjacent to the name of the writer for that day. Expenses of the business, except as hereinafter noted, were often entered as an "out" after the last name. The "ins" and the "outs" were totaled on each summary sheet. The *162 smaller was subtracted from the larger and the difference was entered as the net blue (winnings) or red (losses) for the week's operation. The amount of "overlay" bets collected by the writers was not included in the "ins" recorded on the books of the Orlando lottery appearing opposite to the writers' names. The records of the Orlando lottery and to a lesser degree the Cotton lottery differed from the Mike, Oviedo, and P-W lotteries in that they involved overlay transactions. The records of the Orlando lottery for the 3-week period January 7, 1950, to January 21, 1950, include the following entries relative to overlay immediately after the names of the writers: (Date)
Name
In
Out
(1- 7-50)
Overlay In
$4,297.55
$3,936.50
Hoyt
5,300.00
(1-14-50)
Overlay In
3,832.15
486.00
Hoyt
4,900.00
(1-21-50)
Overlay In
3,169.00
1,680.00
Hoyt
4,600.00 All of the above entries were included in the computation of the total "ins" and "outs" for each day. The amounts identified as "overlay in" represented the amounts of bets received by petitioners in excess of the limits of their writers. The amounts shown in the "out" column to the right of "Hoyt" *163 correspond with the amounts laid off with Mathews-Shepherd on each date. The total amounts of "overlay in" bets received during this 3-week period were approximately 37 per cent of the total of "in" bets shown as received by petitioners. The records of the Orlando lottery during the period January 28, 1950, to January 20, 1951, differ from the records of the first 3 weeks of 1950 in that only one entry appears on each weekly summary sheet relative to the overlay transactions. With five exceptions, the entries are designated as "overlay out" and are included in the computation of the total "outs" for the day. On the following five dates the entries for overlay were included in the "in" column and designated under the "name" column as follows: (Date)
Name
In
Out
( 2-11-50)
Hoyt-Hits
$ 1,077.35
( 4-29-50)
Overlay
10,298.90
( 6-10-50)
Overlay In
1,589.35
( 7-22-50)
Overlay In
87.10
(10- 7-50)
Overlay In and
Out
14,000.00
$13,082.00
On February 11, 1950, April 29, 1950, and October 7, 1950, a number on which the petitioners laid off with Mathews-Shepherd won. The amount of the "hits" on each of these dates was as follows: Date
Amount of "Hit"
February 11, 1950
$ 7,000.00
April 29, 1950
28,000.00
October 7, 1950
14,000.00
*164 The week ended June 10, 1950, was the only week during the period January 7, 1950, to January 20, 1951, that the petitioners did not lay off with Mathews-Shepherd. January 20, 1951, was the last day on which the petitioners laid off with Mathews-Shepherd. The records of the Orlando lottery during the period January 27, 1951, to October 27, 1951 (the last day of petitioners' Orlando operation), reflect no overlay entries above the totals of the "ins" and "outs." At the lower portion of the summary sheets appear overlay entries which, with three exceptions, are designated as "overlay in." The three summary sheets for weeks ended May 26, 1951, August 11, 1951, and September 8, 1951, reflect entries for "overlay out" in the amounts of $963, $2,592, and $5,769, respectively. On the days when an "overlay out" figure is shown, there is no figure showing the receipt of any "overlay in" bets. The majority of the "overlay in" figures during this period (January 27, 1951, to October 27, 1951) are designated as "Blue." The total amount of the "overlay in" receipts shown for this period is approximately 29 per cent of the total amount of "ins" shown for this period. During the period January 6, 1951, to *165 September 15, 1951, the last day of the Cotton operation, the summary sheets of the Cotton lottery, with six exceptions, reflect entries for "overlay in" which are not included in the computation of the net red or blue for the week's operation. The amount of overlay was not included in the "ins" entered adjacent to the writer's name and constituted an additional sum turned over to petitioners. The books of the Orlando lottery show total receipts, or "ins," for 1950 in the sum of $415,594.60 and total expenditures, or "outs," of $363,058.44. Included in the expenditures is a nondeductible item of $200 representing a "political contribution," but there is not included any figure representing bonuses paid. There is also included in the expenditures (for February 18, 1950) an item of $165 explained as "Bondsman." The total receipts and expenditures of the so-called Mike lottery for 1950 were in the respective amounts of $4,342.25 and $3,019 (plus a bonus). The total receipts and expenditures of the Cotton lottery for 1950 were in the respective amounts of $58,970.20 and $46,146.15 (plus bonuses). The total receipts and expenditures of the Oviedo lottery for 1950 were in the respective *166 amounts of $41,977.85 and $23,703.65. The receipts and expenditures of the so-called P.W. Book for 1950 were in the respective amounts of $2,451.95 and $808 (plus bonuses). During the year 1950, petitioners "laid off" or placed hedging bets with Mathews-Shepherd in the total gross amount of $147,250. Commissions were credited against this sum in the total amount of $29,843.75. During this year petitioners won from these bets a total of $66,500. Of these winnings $49,000 was reflected on the books of the Orlando lottery by "netting" entries. Of the gross amount bet with Mathews-Shepherd during this year, $14,800 was reflected on the books of the Orlando lottery as part of the "outs" for January 7, 14, and 21, and $7,000 was reflected in "netted" figures on February 11 and April 29. Thus, petitioners' net unrecorded expenditures in connection with this operation during 1950 were in the amount of $78,106.25. Petitioners' unrecorded receipts in the Orlando lottery from "overlay in" bets during 1950 were at least in an equivalent amount. In 1951 the books of the Orlando lottery indicate total receipts in the sum of $229,255.45 and total expenditures in the sum of $115,685. The latter *167 figure does not include bonuses. In 1951 the total receipts of the Cotton lottery were in the sum of $42,892.60 and total expenditures were in the sum of $30,904.05 (plus bonuses). In 1951 the total receipts of the Oviedo lottery were in the sum of $34,505.05 and total expenditures were in the sum of $19,704. In the first 3 weeks of 1951 petitioners "laid off" or made hedging bets with Mathews-Shepherd in the gross total amount of $6,800, against which was credited a total of $2,210 representing commissions. During this same period there were unrecorded receipts of the Orlando lottery representing "overlay in" bets in a total amount at least equal to $4,590. In addition to their weekly summary sheets the petitioners kept an informational record showing a running account of their transactions with Mathews-Shepherd so that on any given day they would know how their account with Mathews-Shepherd stood. This record was maintained during the period July 9, 1949, to January 20, 1951, the date on which the petitioners' transactions ceased. It reflects entries for lay offs, the amount of commission thereon, amounts won from Mathews-Shepherd on winning bets, the net amount won or lost *168 on the transactions to date, and the resulting amount due Mathews-Shepherd. When a settlement was made with Mathews-Shepherd, the record so reflects; and the running account of the amount due Mathews-Shepherd is started anew. In 1951, after the termination of petitioners' relations with Mathews-Shepherd, they made lay-off bets with the S. & G. Syndicate of Miami and with Winston Reynolds of Tallahassee. No records were kept of these transactions and the net results of these bets are not disclosed. The petitioners made almost all of the entries in their records. Boynton had studied bookkeeping. Strawder is exceptionally competent with figures. The petitioners paid some of their larger writers a bonus in addition to their regular 12 1/2 per cent commission. The bonuses to the Orlando lottery writers were computed on the basis of 10 per cent of the excess of the "ins" over the "outs" adjacent to the writers' names on the weekly summary sheets. Charles Cotton and Stanley Bass received a bonus of 40 per cent of such excess as shown by the records of the Cotton lottery. Bonuses were also paid to certain individuals connected with the Mike and P-W lotteries. Petitioners paid bonuses *169 to their writers in 1950 in the total amount of $14,688.85, and in 1951 in the total amount of $4,198. During the taxable years 1949, 1950, and 1951 Strawder, in addition to the lotteries previously discussed, operated a lottery in partnership with E. B. Smith. Strawder received 66 2/3 per cent of the profit from this lottery and Smith received 33 1/3 per cent. During the years 1950 and 1951, Strawder received taxable income from this lottery as follows: 1950
$7,799.17
1951
5,226.50 Boynton did not share in this income. During the taxable year 1950, Boynton operated a dice game in the Flamingo Club for approximately 3 weeks. Boynton realized net income of $5,030 during this 3-week period. Strawder did not share in these winnings. On September 15, 1951, the Flamingo Club was raided by State law enforcement officers. Petitioners' gambling records were seized as evidence. On December 12, 1951, Strawder, Boynton, and five others were tried on charges of illegal gambling and violation of State beverage offenses. Strawder and Boynton were convicted and sentenced to 1 year in jail. Subsequently, however, in 1953 the convictions were reversed by the Supreme Court of *170 Florida. During the pendency of this criminal proceeding the records of petitioners' gambling operations were retained by the State but were available for petitioners' inspection and were, in fact, inspected by petitioners on one occasion. A part of them was returned to petitioners in 1954. Respondent's examining officers commenced their investigation in November 1952. At that time they contacted Strawder and requested that they be allowed to inventory his safe-deposit boxes. Strawder refused to let them do so. On December 17, 1952, the examining officers again contacted Strawder and requested that they be allowed to inventory his safe-deposit box. Again, Strawder refused, stating that he did not think it was any of the Government's business what he had in his safe-deposit box. The examining officers found that Strawder had access to 3 safe-deposit boxes. The examining officers asked Strawder about his arrangement with Mathews-Shepherd. Strawder told them that he received 25 per cent of the net gain but did not advise them that he also received a 10 per cent commission on all sums laid off. Respondent's examining agents, upon being informed that the petitioners' gambling records *171 were in the custody of the Criminal Court of Orange County, contacted the clerk of the court and made an extensive examination of the records. They made complete hand transcriptions of petitioners' "in and out books" for the years 1950 and 1951 and subsequently obtained photostatic copies of these books. In addition to the "in and out records" the examining officers found a number of blank, unused printed forms, adding machine tapes, numerous little pads used by the writers, and the record hereinabove mentioned which was kept to reflect a running account as to what the petitioners owed Mathews-Shepherd from one week to the next. In October 1953 the examining officers interviewed Boynton and asked him what his part was in the operation of the Boynton-Strawder Cuba operation. Boynton made a written statement stating that he "didn't keep any records or collect any money." Boynton had in fact kept the records of the Cotton lottery and had made entries into the informational Mathews-Shepherd record. Strawder computed the figures shown on his 1949 and 1950 returns. In arriving at the reported figures, Strawder made no effort to compute the "ins" and "outs" shown by the records of the *172 Orlando, Cotton, P-W, Oviedo, or Mike lotteries. He made no effort to compute the income from his arrangement with Mathews-Shepherd. Strawder claimed deductions for automobile, meal, and lodging expenses for the reason that they were related to his gambling transactions. Strawder's joint return for 1949 and his individual return for 1950 were prepared by Robert A. Brinson, a public accountant, on the basis of verbal information supplied by Strawder. Strawder showed none of his records to Brinson; did not tell Brinson he had any records; and advised Brinson that he was a salesman. During the taxable year 1949 Strawder realized taxable net income of $3,318.62 in excess of that reported by him. During the taxable year 1950 the petitioners realized income from their partnership operations in the amount of $57,569.58. Each of the petitioners is taxable on 50 per cent of the income so realized. During the taxable year 1950 Strawder realized taxable income * in the amount of $34,938.71, calculated as follows: Distributive share of Strawder-Boyn-
ton operations
$28,784.79
Net profit from E. B. Smith lottery
7,799.17
Less: Expenses per return
(1,645.25)
*173 During the taxable year 1950 Boynton realized taxable income * in the amount of $33,814.70, computed as follows: Distributive share of Strawder-Boyn-
ton operations
$28,784.79
Profit from operation of dice game
5,030.00
During the taxable year 1951 the petitioners realized income from their partnership ** operations in the amount of $130,324.48. Each of the petitioners is taxable on 50 per cent of the income so realized. During the taxable year 1951 Strawder realized taxable income * in the amount of $70,388.74, calculated as follows: Distributive share of Strawder-Boyn-
ton operations
$65,162.24
Share of net profit from E. B. Smith
lottery
5,226.50
During the taxable year 1951 Boynton realized taxable income from the Strawder-Boynton ** operations in the amount of $65,162.24. It is stipulated that each petitioner *174 is entitled to deductions on account of losses incurred in the operation of the Flamingo Club (without reference to the gambling operations) for the years 1950 and 1951 in the respective amounts of $7,271.59 and $2,918.94 "and such deductions have been taken into account in our findings concerning the taxable income realized by petitioners and each of them from the partnership operations." *
Petitioner Boynton is entitled to a deduction in each of the taxable years 1950 and 1951 in the amount of $1,000, representing a capital loss carryover. For the year 1951 petitioner Strawder filed estimates on March 21, 1951, June 20, 1951, September 20, 1951, and January 28, 1952, with each of which he paid $537. Petitioner Boynton filed no estimate for that year or for 1950. Part of the deficiency in income tax due from Strawder for each of the years 1950 and 1951 is due to fraud with intent to evade tax. Part of the deficiency due from Boynton for each of the years 1950 and 1951 is due to fraud with intent to evade tax. Strawder is liable for the additions to the tax *175 prescribed by section 294(d)(2) for the years 1950 and 1951. He is liable for the addition to the tax prescribed by section 291(a) for the year 1951. Boynton is liable for the addition to the tax prescribed by section 294(d)(1)(A) and (d)(2) for each of the years 1950 and 1951. He is liable for the addition to the tax prescribed by section 291(a) for the year 1951. Opinion KERN, Judge: In connection with the income tax liability of petitioner Strawder for the year 1949, we have before us the following evidence: (1) The income tax return of that petitioner for 1949, in which he described himself as a salesman and reported "total receipts" in the sum of $8,653.10, an amount not supported by any books or records but purporting to represent what that petitioner considered to be his gross income for that year; (2) Strawder's testimony that he and one Rhodes Boynton (succeeded after his death on November 6, 1949, by his brother, A. W. Boynton) were equal partners in a nightclub and gambling enterprise, such partnership being formed in February 1949; (3) testimony of Strawder that he and Rhodes Boynton lost around $40,000 in the operation of their partnership business; (4) evidence *176 corroborating the stipulation that "[during] the taxable year 1949, Strawder received commissions from Mathews-Shepherd in the amount of $6,637.25" which "were not reported by Strawder in his federal income tax return for the year 1949"; and (5) testimony that Rhodes Boynton was entitled as a partner to an equal share in these commissions and that they were in fact devoted to and used by the partnership business. At this point we observe (and this observation is pertinent to our later discussion of other issues) that Strawder's testimony and demeanor on the witness stand made a bad impression on us. Much of his testimony was vague, evasive, and contradictory. We reject Strawder's self-serving testimony that he and Rhodes Boynton operated their partnership business at a loss during 1949 of $40,000 or any other amount. This is contradicted by his own return for that year, inadequate and inaccurate though it be, which reported net taxable income of $7,394.50 and indicated no losses. We accept Strawder's testimony that he and Rhodes Boynton were equal partners in the gambling enterprise during the greater part of 1949, and that A. W. Boynton succeeded Rhodes Boynton as an equal *177 partner after the latter's death. This is consistent with respondent's determination (which is not questioned) that A. W. Boynton was an equal partner with Strawder in the gambling enterprise during 1950 and 1951. Accordingly, we accept Strawder's testimony that he and Rhodes Boynton (succeeded by A. W. Boynton) shared equally in the receipt of commissions from Mathews-Shepherd. Therefore, we conclude that Strawder received in 1949 unreported income in the amount of $3,318.62. With regard to the years 1950 and 1951, involving both Strawder and Boynton, the principal problems presented with regard to the tax liability of these petitioners are: (1) Whether and to what extent the amounts of bets received and recorded on the books of two lotteries as "ins" include the receipt of amounts of so-called "overlay ins," an esoteric term used in the gambling business the meaning of which we have tried to explain in our findings of fact, and (2) whether and to what extent petitioners are entitled to deductions on account of their transactions with Mathews-Shepherd during those taxable years. Upon the question of the "overlay ins" we have rejected the unsatisfactory testimony of petitioners *178 and have relied upon a mass of documentary evidence, including the treatment of these on the books of the Orlando lottery for the first 3 weeks of 1950 and the weeks subsequent to the third week in 1951, the "netting" of certain amounts recorded in other weeks in 1950, the computation of bonuses to writers, and the computations appearing on certain adding machine tapes, together with the testimony of participants in the Cotton lottery, in concluding that the "overlay in" bets received by petitioners were not included in the "in" bets recorded on their books. With regard to the amounts expended by petitioners in connection with their transactions with Mathews-Shepherd, we have concluded that the net amounts of such expenditures not already reflected on petitioners' books are properly deductible by petitioners. We have computed, not without difficulty, the amounts which we consider to be thus deductible and have made appropriate findings with regard to them. With regard to the amounts of "overlay in" bets received by petitioners during the years 1950 and 1951 and not reflected on their books, the record does not furnish us any method by which these amounts may be determined with *179 mathematical exactness. Judging by the ratio of the "overlay in" bets actually recorded to the "in" bets, we consider and have so concluded that the amounts of the unrecorded "overlay in" bets were at least equal to the net unrecorded expenditures made by petitioners to Mathews-Shepherd. In computing the net unrecorded expenditures made by petitioners to Mathews-Shepherd, we consider that the commissions payable to petitioners on account of their own bets placed with Mathews-Shepherd should be subtracted. In spite of the stipulation that Strawder "received" certain commissions in 1950 and 1951, it is apparent from documentary evidence before us that such receipts were in the form of a credit entry on a running account. It is our conclusion that since the net unrecorded amount of those expenditures thus computed was equal to the amount of unrecorded "overlay in" bets, there should be no deduction by petitioners on account of such expenditures and no additions to petitioners' taxable income on account of "commissions" upon those expenditures. Petitioners argue that "lay-off" bets made by them to a Miami syndicate and to a gambler in Tallahassee are deductible by them in 1951. The *180 only evidence as to these bets is the oral testimony of petitioners. There are no records, as in the case of the Mathews-Shepherd transactions, showing the amounts (if any) or the net result of these bets. On the record before us we are unable to conclude that any deductions are allowable on account thereof. Petitioners made a contention that in computing their taxable income for 1950 and 1951 consideration must be given to an operating loss claimed to have been sustained in 1949. As we have already indicated, we do not believe that such a loss was incurred. Even if there were such a loss, it would not be available to petitioners in 1950 and 1951 by carryover. See Roy T. Offutt, 16 T.C. 1214. This, of course, is not applicable to the losses stipulated as having been sustained from the operation of the nightclub (as distinguished from the gambling operations) during 1950 and 1951. The additions to tax prescribed by section 294(d)(2) for substantial underestimate of estimated tax must be made with regard to petitioners for the years 1950 and 1951, since it is apparent that there were underestimations of tax within the meaning of that subsection and its application is *181 mandatory. The additions to the taxes of petitioner Boynton under section 294(d)(1) for failure to file declarations of estimated tax for the years 1950 and 1951 are required since Boynton has not proved that his failure to file such declarations was due to reasonable cause. With regard to the additions to tax determined by respondent under section 291(a) against both petitioners for their failure to file returns for 1951, petitioners argue that their failure to file such returns was due to reasonable cause in that their records were in the hands of officials of the State court during 1952 and subsequently, and that it was therefore impossible for them to prepare and file such returns. This argument is not without ironic humor in view of the lack of correlation between their records and the returns by petitioners in prior years. Strawder testified that petitioners were afforded the opportunity of examining their records after they were seized by State authorities in order to determine the winners of bets placed with them. If the petitioners were granted the right to inspect their records for that purpose, it is impossible for us to conclude that they could not have inspected these *182 records for the purpose of preparing their Federal income tax returns. We can only suppose that petitioners were more interested in fulfilling their obligations to local gamblers than in fulfilling their obligations as taxpayers of the United States. We next consider the additions to tax determined by respondent under section 293(b) for the alleged reason that parts of the deficiencies in tax here involved were due to fraud with intent to evade tax. Upon this issue respondent has the burden of proof. With regard to the addition to tax determined by respondent against petitioner Strawder for the year 1949 under this subsection, we have concluded that respondent has not borne successfully his burden of proof. The only item of unreported income is an amount representing one-half of commissions "received" by Strawder on bets which he himself made on behalf of the gambling enterprise carried on by him and his partner. Respondent has not shown the net results of those bets. "Our conclusion that [Strawder] [has] not successfully borne the burden of proof as to the greater part of the [deficiency] in tax determined by respondent does not relieve the respondent of the necessity of *183 sustaining his burden as to the fraud issue." Sidney Cohen, 27 T.C. 221, 228. As to each of the years 1950 and 1951 it is our opinion that respondent has proved by clear and convincing evidence that a part of the deficiencies of each petitioner was due to fraud with intent to evade tax. With regard to those years respondent has proved that both petitioners failed to report amounts of income so large in themselves and so large in relation to the amounts of income returned by petitioners as to justify a conclusion that their failure to report this income constituted fraud with intent to evade tax within the meaning of the statute. This conclusion is substantiated by other evidence contained in the record before us, including the nature of their business, the method of its operation, the character of their records and Federal tax returns, and their lack of cooperation with respondent's agents. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: W. R. Strawder, Jr., Docket Nos. 52735, 52772; and A. W. Boynton, Docket No. 60455.↩
1. Tax computed from Supplement "T."↩
*. The following deleted by Order dated June 2, 1958: "from his gambling operations".↩
*. The following deleted by Order dated June 2, 1958: "from his gambling operations".↩
**. The following deleted by Order dated June 2, 1958: "gambling".↩
*. The following deleted by Order dated June 2, 1958: "from his gambling operations".↩
**. The following deleted by Order dated June 2, 1958: "gambling".↩
*. So much of the foregoing sentence as begins with "and such" was added by Order dated June 2, 1958.↩